**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BENJAMIN DENNERLEIN,        )
                       Petitioner,    )
                                )
    vs.                           )       Civil Action No. 16-780
                                )       Magistrate Judge Maureen P. Kelly
MARK GARMAN, Superintendent of  )
S.C.I. Rockview; ANTHONY BEROSH,  )
District Attorney of Beaver County;   )
KATHLEEN KANE, The Attorney General )
of the State of Pennsylvania,        )
                      Respondents.  )

## OPINION AND ORDER

      Benjamin Dennerlein ("Petitioner"), has filed this pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition"), ECF No. 1, seeking to attack his state court conviction for first degree murder of the woman who had rented Petitioner a room in her home. Petitioner was sentenced to life in prison without parole for the first degree murder conviction.

      For the reasons that follow, the Petition will be denied because none of the three grounds for relief merits the grant of federal habeas relief. Furthermore, because jurists of reason would not find this disposition of the Petition debatable, a certificate of appealability will also be denied.

## I. FACTUAL BACKGROUND

      The Pennsylvania Superior Court in its November 16, 2014 Memorandum, adopted, as its own, the summary of facts which the Post Conviction Relief Act ("PCRA") trial court provided as follows:

[The Victim], age 54, resided at 1475 Fifth Avenue, Freedom, Beaver County, in a residence owned by her and Robert Campbell, a former paramour, with whom she maintained a friendly relationship. [The Victim] was a frail woman in poor health, suffering from various medical conditions[,] which caused her to be unsteady and prone to falling on occasion. [The Victim] and Mr. Campbell purchased the residence in 2003, subject to a mortgage; however, the property was titled solely in [the Victim's] name because of Mr. Campbell's unstable financial condition. Subsequently, [the Victim] transferred the title by deed dated February 28, 2008, to herself and Mr. Campbell, as joint tenants with the right of survivorship....

[The Victim] and Mr. Campbell [ ] lived together for approximately ten years until May[ ] 2008, when Mr. Campbell left the residence to commence a live-in relationship with his current wife, Karen Otrhalik Babich. Mr. Campbell and Ms. Babich commenced their relationship in December[ ] 2007, which culminated in their marriage in October[ ] 2008.

Mr. Campbell's last contact with the [V]ictim occurred on May 8, 2009, when she telephoned to inform him that on May 7, 2009, she had received and deposited the sum of $31,128.14, representing her share of the proceeds from the sale of her parents' cottage in Erie. They discussed the uses to which she could put the funds. [The Victim] maintained a personal checking/credit/debit account with the Northern Lights branch of ESB Bank[,] which she opened [on] May 19, 1997. The account was limited to withdrawals of $510.00 per 24–hour period.

Mr. Campbell was introduced to [Appellant] approximately four years prior to the [V]ictim's death while both were inmates in the Beaver County [Jail] for reasons unrelated to the instant case. Upon release from incarceration, Mr. Campbell and [Appellant] maintained a friendly relationship, and [Appellant] resided with Mr. Campbell [and the Victim] from time to time when he was in need of a temporary residence. All three individuals were users of and smoked cocaine together on occasion. In December[ ] 2008, and continuing until the time of [the Victim's] death, [Appellant] resided at the [V]ictim's home, paying rent in the amount of $50.00 per week. [Appellant] was employed at Crow's Run Recycling as a salesperson from 2008 through May 13, 2009.

Prior to her death, [the Victim] was employed as a cashier at the Center Township Wal–Mart. [The Victim] last worked on May 11, 2009, from 11:00 [a.m.] until 8:00 [p.m.] and was observed at work by her neighbor, Dwight McMorris, while he was shopping at [the] Wal–Mart. Mr. McMorris subsequently observed the [V]ictim between 8:40 [p.m.] and 8:50 [p.m.] on the same day as she drove by his home on the way to her residence after completing her work day. Mr. McMorris was the last person other than the perpetrator to see [the Victim] alive.

[The Victim] was scheduled to work on May 12, 2009, from 11:00 [a.m.] to 8:00 [p.m.]; however, she did not appear for work [or] call to indicate that she would not be present for work that day, which was unlike her because she was a reliable employee. Shortly before her death, [the Victim] reported to one of her co-workers, Nancy Pranskey, that [Appellant] had been stealing from her and using her credit/debit card to purchase items. Bank records disclosed that on May 5, 2009, [the Victim's] bank account had been overdrawn by $741.11 as a result of eight transactions.

[Appellant] also did not appear at his place of employment on May 12, 2009, and terminated his employment due to a disagreement with his employer, Nick D'Itri, by way of a text message on May 13, 2009, at 12:52 [p.m.] [Appellant] had been a good employee until approximately one month prior to terminating his employment when he began not reporting for work. The prior week he failed to appear for work on four consecutive days. His employer suspected that drug use was responsible for [Appellant's] decline in performance. [Appellant's] last working day was May 11, 2009.

Between 10:00 [a.m.] and 10:30 [a.m.] on May 12, 2009, Mr. Campbell sought [Appellant] at his place of employment. Not locating him at work, Mr. Campbell proceeded to the [V]ictim's residence and found [Appellant] present. Mr. Campbell noted that [Appellant] appeared to be under the influence of drugs. When Mr. Campbell inquired of [Appellant] as to the whereabouts of the [V]ictim, [Appellant] replied that he had taken her to work earlier that morning, because he was in need of her vehicle to run errands. Mr. Campbell, who maintained various items of personal property at the residence, searched the home to assure that his belongings were present and was followed through the house by [Appellant]. When looking into the [V]ictim's bedroom, Mr. Campbell observed that the bed had been made, which was unusual because the [V]ictim was a poor housekeeper and never made the bed. [Appellant] was directly behind Mr. Campbell as he was in the doorway to the [V]ictim's bedroom. [Appellant] and Mr. Campbell became involved in a heated argument over [Appellant] not working to pay rent to the [V]ictim and his drug use. Mr. Campbell informed [Appellant] that he would return to the residence between 8:30 [p.m.] and 9:00 [p.m.], when the [V]ictim returned from work, to speak with [Appellant] and the [V]ictim.

Later in the same day at 3:25 [p.m.] [Appellant], using the [V]ictim's credit/debit card, made a balance inquiry at ESB Bank located at 921 Third Avenue in New Brighton. [Appellant], utilizing the [V]ictim's credit/debit card, purchased various items at the Chippewa Township K–Mart between 6:51 [p.m.] and 7:09 [p.m.] and proceeded to the home of Gregory "Wimpy" Price and Wendy McCoy to deliver items to Mr. Price, including video games, movies[,] and an electric can opener, to reimburse Mr. Price for tires that he purchased....

[B]etween 8:30 [p.m.] and 9:00 [p.m.] on May 12, 2009, Mr. Campbell and his wife returned to the [V]ictim's residence and found no one present. The [V]ictim's vehicle was not in the area. Throughout the evening and into the early morning hours of May 13, 2009, Mr. Campbell attempted on 30 occasions to reach [Appellant] and on 17 occasions to contact the [V]ictim by telephone and through text messages[,] indicating his desire to speak to them. He received no responses, except that [Appellant] sent a text message advising that the Baden police would be interested in Mr. Campbell's use of marijuana. During the evening, Mr. Campbell and his wife left and returned to the [V]ictim's residence on two additional occasions and did not find anyone or the [V]ictim's automobile at the home. They left for the final time at approximately 12:00 [a.m.], returned to their residence[,] and retired for the night.

On May 13, 2009, at approximately 12:26 [a.m.], [Appellant] checked into Room 12 of the Beaver Falls Motel in Beaver Falls, following which he contacted Laura Rankin[ and] ask[ed] her to join him in smoking crack cocaine. Ms. Rankin telephoned Jennifer Burns, requesting that she provide transportation to the motel. Jennifer Burns and Bryan Silberger retrieved Ms. Rankin and her infant child and drove to the motel to meet [Appellant]. Ronald "Toot" Goodman, the father of a child with Ms. Burns, and Patrick Brown, a supplier of crack cocaine for [Appellant], also appeared at the motel. Mr. Brown provided the cocaine to [Appellant]. [Appellant], when asked the reason for being in possessing [sic] of the [V]ictim's vehicle, informed Ms. Rankin that the [V]ictim was away on vacation visiting her niece in Maryland or Virginia. [Appellant] told Mr. Silberger that the [V]ictim was away in Maryland to visit her brother for a week. [Appellant], in an effort to assure Mr. Brown, his cocaine supplier, that he had sufficient funds when requesting Mr. Brown to provide an advance of drugs, had previously forwarded a text message to him on May 9, 2009, showing a balance in the [V]ictim's bank account of $29,712.14. [Appellant] and the other individuals smoked crack cocaine throughout the early morning hours of May 13, 2010, until approximately 5:00 [a.m.] During that time, [Appellant] and Ms. Rankin left the motel and proceeded to two convenience stores to purchase items and attempted to obtain funds using the [V]ictim's credit/debit card. At one point in time, [Appellant] advised Ms. Rankin that he was using the [V]ictim's credit/debit card, showed her the balance in the account and stated to her, "stick with me and good things will happen[."]

Mr. Campbell, accompanied by two friends, Martin Costanza and Justin Hertnecky, proceeded to the [V]ictim's residence on May 13, 2009, between 8:30 [a.m.] and 9:00 [a.m.] No one was present and the [V]ictim's car was not at the residence. The three of them gathered [Appellant's] belongings, placed them in garbage bags[,] and stored the bags in the garage of the residence. Mr. Campbell opened the [V]ictim's bedroom door and found the bed in the same condition as the day before, as if it had not been disturbed. They then left the residence and

returned to Mr. Campbell's house for the balance of the morning. Mr. Campbell's intention was to evict [Appellant].

After leaving the motel and driving his friends home, [Appellant] claimed to have returned to the [V]ictim's residence to locate her, found that she was not present, that her bed did not appear to have been slept in, and then proceeded to the Beaver Valley Mall. At 1:15 [p.m.] on May 13, 2009, [Appellant] presented a check made payable on the [V]ictim's account to himself in the amount of $1,000.00 at the ESB Bank in Beaver Falls. The memo portion of the check indicated the words, "roof/porch[."] [Appellant] explained that he had performed work for the [V]ictim and the check represented payment. Ms. Celeste, the [V]ictim's [next-door] neighbor, indicated that no recent work had been done on the house. The bank representative requested identification from [Appellant], since he did not have an account with the bank, and he provided his driver's license. The check was drawn on the Northern Lights ESB Bank located in Baden. The Beaver Falls ESB Bank manager telephoned the Northern Lights branch and obtained a facsimile of the signature card of the [V]ictim. The Beaver Falls branch manager also placed two telephone calls to the [V]ictim's residence and the telephone was not answered on either occasion. After being unable to verify [Appellant's] correct address and telephone number or the [V]ictim's signature, the bank refused to cash the check and returned the check to [Appellant].

Trooper Robert Negherborn, a forensic document examiner with the Pennsylvania State Police Crime Laboratory, recovered from the face of the subsequent check in the [V]ictim's checkbook the impression of the writing depicting the text of the previous check payable to [Appellant], including the authorizing signature. [Trooper Negherborn] was further provided with handwriting samples of the [V]ictim and [Appellant]. Although not issuing a conclusive opinion, Trooper Negherborn testified that in comparing the writing on the check with the samples of the handwriting of the [V]ictim and [Appellant], there was a strong probability that the signature on the check was not that of the [V]ictim. He further opined that there were no significant similarities to indicate that the [V]ictim or [Appellant] wrote the entries on the check, or that [Appellant] wrote the signature on the check.

At approximately 2:00 [p.m.] on May 13, 2009, [Appellant] purchased tennis shoes at the Shoe Department Store at the Beaver Valley Mall using the [V]ictim's credit/debit card. A short time later[,] he attempted to return the tennis shoes for a cash refund without the credit/debit card and was refused. [Appellant] was accompanied by Ms. Rankin and met Mr. Price while at the Beaver Valley Mall and purchased other items with the [V]ictim's credit/debit card. He also attempted to buy tennis shoes for Mr. Price using the [V]ictim's credit/debit card and was refused.

At approximately 1:00 [p.m.], Kelly Carter, who had previously made payment of $500.00 for the purchase of an automobile from [Appellant], telephoned [Appellant] informing him that he was at the residence desiring to retrieve the vehicle from the garage. [Appellant] advised Mr. Carter that he would not arrive for a period of time, and Mr. Carter waited. When [Appellant] failed to appear, Mr. Carter made a second telephone call, at which time [Appellant] instructed Mr. Carter to enter the home to obtain the remote control for the garage door. At the direction of [Appellant], Mr. Carter entered the house by way of a window and was unable to locate the remote control while continuing to speak to [Appellant] on the telephone. Mr. Carter then telephoned Mr. Campbell, who subsequently arrived and informed Mr. Carter that he was in possession of the remote control and would not permit the removal of the vehicle until [Appellant] appeared. Mr. Carter placed a third call to [Appellant], who indicated he would return later. Both Mr. Campbell and Mr. Carter observed what appeared to be blood on the [V]ictim's dog and entered the house to investigate. Mr. Campbell entered the [V]ictim's bedroom and discovered a pool of blood on the bed where the blanket had been pulled away. He called Mr. Carter into the bedroom to observe the blood. Mr. Carter then telephoned [Appellant], informed him of their findings[,] and inquired whether he knew the whereabouts of the [V]ictim, to which [Appellant] replied that he thought she was at work. Mr. Carter told [Appellant] he should return to the residence immediately. [Appellant] indicated that he was at the Beaver Valley Mall and would return home at a later time. He also stated that he had not been at the residence for several days. Mr. Campbell, after contacting the [V]ictim's employer and the hospital in an unsuccessful attempt to locate her, placed a call to 9–1–1 at 2:54 P.M. Freedom Borough Chief of Police John Hill and Officer William Dreyer of the Freedom Borough Police Department responded to the call at approximately 3:00 [p.m.] Andrew Gall of the Beaver County Detective Bureau received a call for assistance from the Freedom police officers at 3:10 [p.m.] and responded to the residence with County Detectives Timothy Staub, Kim Clements, Timmie Patrick[,] and Robert Chamberlain.

A search of the residence disclosed the [V]ictim's body wrapped in blankets in a stairwell on the second floor leading to the attic, which was located between the bedrooms of the [V]ictim and [Appellant] and could be accessed from both bedrooms. The police found no evidence of forced entry into the home. When informed of [the Victim's] death, Mr. Campbell became extremely distraught. As a result of receiving information from Ms. Rankin's mother that Ms. Rankin was with [Appellant] in her vehicle at the Beaver Valley Mall, a BOLO (be on look out) alert was broadcast for [Appellant], the [V]ictim's vehicle[,] and the vehicle being operated by Ms. Rankin and owned by [Ms. Rankin's] mother. Ms. Rankin received telephone calls from a friend and her mother advising that the names of [Appellant] and Ms. Rankin were heard on the [police] scanner indicating that the police were attempting to locate [Appellant].

Detective Patrick proceeded to [Appellant's] place of employment and in speaking to Mr. D'Itri[,] found that [Appellant] last worked on May 12, 2009, and terminated his employment on May 13, 2009. Mr. D'Itri provided [Appellant's] cellular telephone number to Detective Patrick, who attempted several calls and text messages to [Appellant] with no response.

At 6:07 [p.m.], Officer Maxim Strano of the Center Township Police Department, in response to the alert, located [Appellant] and Ms. Rankin in the automobile being operated by Ms. Rankin as it was backing out of a parking space at the Beaver Valley Mall. [Appellant] stated to Ms. Rankin "to go or he was going to run[."] Officer Strano drew his weapon, ordered both individuals to the ground, approached [Appellant,] and placed [Appellant] in handcuffs. [Appellant] stated that he thought about running and should have run when he saw the officer. [Appellant] also indicated that Officer Strano had the wrong man. The [V]ictim's credit/debit card was found in [Appellant's] wallet. The [V]ictim's vehicle was also located a short distance away.

[Appellant] and Ms. Rankin were transported to the Center Township Police Department. At 6:39 [p.m.], [Appellant] waived his [*Miranda* ] rights and agreed to speak with Detectives Patrick and Clements. [Appellant] was informed of [the Victim's] death and showed no emotion. He indicated that in the evening hours of May 11, 2009, he and his girlfriend, Colleen Cantella, were at the [V]ictim's residence viewing the Pittsburgh Penguins/Washington Capitals hockey game. [Appellant] further advised that the [V]ictim came home from work during the hockey game. According to [Appellant], Ms. Cantella departed after the hockey game to return to her residence. This information was contrary to the statement made by Ms. Cantella that she was not at the [V]ictim's residence on May 11th and that [she and Appellant] had exchanged text messages between 9:23 [p.m.] and 10:07 [p.m.] near the end of the hockey game, when she was at her own residence....

[Appellant] stated that on May 12, 2009, he drove the [V]ictim to work at Wal–Mart at approximately 10:00 [a.m.], attended to several errands[,] and returned to the residence, when he made contact with Mr. Campbell and a verbal argument ensued. After the disagreement with Mr. Campbell, he advised that he left the residence, ran a few more errands[,] and went on a crack cocaine binge. He stated that he returned to Wal–Mart between 8:00 [p.m.] and 8:30 [p.m.] to pick up [the Victim], and when she did not come out to the vehicle, he went into the store and was told that she was not at work all day. He also advised the detectives that he tried to call [the Victim] and received no reply. The [V]ictim did not report to work on May 12, 2009, and video footage of the entrance and the customer service area of Wal–Mart disclosed that [Appellant] did not appear at the relevant time....

[Appellant] obtained crack cocaine from Mr. Price and checked into the Beaver Falls Motel to smoke crack cocaine with Ms. Rankin and her friends. They all remained at the motel into the early morning hours of May 13, 2009. [Appellant] advised that he checked out of the Beaver Falls Motel at approximately 11:00 [a.m.] and returned to the residence to look for the [V]ictim. He found that her bed was made and did not appear to have been slept in. [Appellant] then proceeded to the Beaver Valley Mall where he met Mr. Price and offered to purchase tennis shoes for him as payment for cocaine previously supplied by Mr. Price. [Appellant] attempted purchases at two separate retail locations using the [V]ictim's credit/debit card and was rejected. [Appellant] advised that he had the information regarding the [V]ictim's credit/debit card, including the [V]ictim's personal identification number (PIN) to access the account. [Appellant] related that he obtained the credit/debit card from the [V]ictim's purse located in the kitchen of the residence. The detectives were unable to locate the [V]ictim's purse in the kitchen of the home and subsequently found it in the [V]ictim's vehicle. Upon receiving this information, [Appellant] informed the detectives that he had taken the credit/debit card out of the [V]ictim's purse and placed the purse in the automobile. [Appellant] claimed to have permission from the [V]ictim to use the credit/debit card....

Near the conclusion of the interview, which lasted approximately one hour, [Appellant] stated to the detectives that if they were going to arrest him for murder to do so. He further stated that "all I have to do is convince one person" that he did not commit the offense. The [V]ictim's purse, Wal–Mart identification card, driver's license, checkbook[,] and cellular telephones were all located in the [V]ictim's vehicle, which was in the possession of [Appellant].

Prosecutors acquired the [V]ictim's bank records for the period from May 1, 2009, through May 31, 2009, the telephone records of [Appellant] from May 8, 2009, through May 14, 2009, and located various receipts for purchases and automatic teller machine (ATM) withdrawals from the [V]ictim's account in the vehicles of the [V]ictim and Ms. Rankin and in the trash bin at the Beaver Falls Motel....

In addition, Detective Chamberlain obtained documentation from Verizon Wireless depicting the sites of cellular telephone towers in Beaver County from which he was able to confirm the approximate location of [Appellant] when he was using his cellular telephone. This information, together with the known observations of [Appellant] from witnesses and the video displays of [Appellant] at bank ATM and retail locations, placed [Appellant] in the area of the [V]ictim's residence during the hours when she would have been killed and at the various locations at which he made ATM withdrawals and purchases using the [V]ictim's credit/debit card.

An examination of [Appellant's] blue jeans and tennis shoes under a blue light revealed possible blood stains. Samples of the blood of the [V]ictim and

[Appellant], together with [Appellant's] blue jeans, were delivered to the Pennsylvania State Police Crime Laboratory for analysis. Jennifer Badger, a forensic scientist in the serology section, determined that two stains on the outside seam of the lower leg of [Appellant's] blue jeans consisted of blood. She further detected the presence of blood on the eyelet of the toe of [Appellant's] left athletic shoe, but the sample was insufficient for a confirmatory testing for blood. In addition, examination of the handle of a steak knife found in the kitchen sink of the [V]ictim's residence submitted to the crime laboratory disclosed evidence of blood. Ms. Badger prepared samples of dried blood of the [V]ictim and [Appellant] and swabs of the blood on [Appellant's] jeans, tennis shoes[,] and the steak knife for submission to the DNA section of the crime laboratory. Michael Biondi, a forensic scientist supervisor in the DNA section, conducted DNA testing on the swabs of [Appellant's] blue jeans and determined that the blood on the jeans matched the [V]ictim's blood. The DNA profiles of the [V]ictim and [Appellant] could not be excluded as potential contributors of the blood stain from [Appellant's] shoe. The DNA profile of the [V]ictim was excluded as a contributor as to the knife in the kitchen sink, while the DNA profile of [Appellant] could not be excluded as a contributor for the blood on the knife, because there also appeared DNA types from two unidentified individuals.

Dr. James Smith, a forensic pathologist, determined that due to observing the greenish discoloration of the body, signifying the first sign of decomposition, the [V]ictim's death occurred within an 18–hour to 36–hour period between 3:00 [a.m.] and 9:00 [p.m.] on May 12, 2009. Dr. Smith opined that the cause of death was the stab wounds to the neck which incised the right carotid artery and the right jugular vein. He noted a total of 46 knife wounds, 34 of which were located in the left neck region. Dr. Smith further described defensive wounds on the [V]ictim's hands and fingers indicating that the [V]ictim attempted to ward off her attacker. He testified that the concentration of the wounds in the neck area was an indication the [V]ictim was held down and was struck with such force as to penetrate from the left through the right side of the neck. Dr. Smith estimated that the blade of the knife was approximately one-half inch in width and three inches in length. The manner of death was homicide.

James Sarver met [Appellant] on May 15, 2009, while both were inmates in the Beaver County Jail. Mr. Sarver also was familiar with Mr. Campbell from whom he had purchased marijuana in the past. Mr. Sarver related that [Appellant] admitted to him that he had killed [the Victim] and intended to place blame on Mr. Campbell for the crime. In a second conversation with Mr. Sarver, [Appellant] queried as to why Mr. Campbell came to the [V]ictim's residence and removed the sheets on the bed revealing the pool of blood. [Appellant] informed Mr. Sarver of the limit of $500.00 on the [V]ictim's credit/debit card and confirmed that he went partying and shopping after the killing. Mr. Sarver testified that he had previously been a visitor at the [V]ictim's residence, [but was] limited [ ] to the main floor of the house.

Zack Valentine was [Appellant's] cellmate at the Beaver County Jail for approximately two weeks. On May 18, 2009, Mr. Valentine provided a statement to police in which he indicated that he had become acquainted with [Appellant] prior to their incarceration while working at Crow's Run Recycling. Mr. Valentine stated that [Appellant] acknowledged that he had killed the victim, wrapped her in a blue blanket and placed her body in the stairway to the attic between the two bedrooms in the [V]ictim's residence. [Appellant] also outlined [to Mr. Valentine] the layout of the house and provided a diagram detailing the location of the bedrooms and the doorways from each bedroom to the attic. [Appellant] further described [to Mr. Valentine] the placement of a tan blanket covering the blood on the bed and complained that Mr. Campbell had pulled the blanket away exposing the blood. Mr. Valentine, who had never been to the residence, drew a diagram of the residence for the police based upon [Appellant's] description. Mr. Valentine had been unaware of the homicide until his conversation with [Appellant].

[Appellant] presented evidence in an effort to place culpability for the crime on Mr. Campbell by attempting to demonstrate that he had been physically abusive toward the [V]ictim and that he had a financial motive for killing her.

Mr. Campbell testified that the [V]ictim called him shortly after he had moved out of the house and into Ms. Babich's residence, indicating that she desired to title the home in both of their names. Ms. Babich, who was a mortgage processor and notary public, fabricated the transfer by having the deed prepared, notarizing [the Victim's] signature, recording the deed and paying the recording fee and transfer taxes, for which she was subsequently reimbursed.

Patricia Celeste, the [next-door] neighbor and friend of the [V]ictim, observed a black eye on the [V]ictim on one occasion and her leg to be injured at a subsequent meeting, both injuries which the [V]ictim attributed to [Appellant]. When Ms. Celeste confronted [Appellant] regarding the incidents, he apologized for his actions. He further explained that the black eye occurred when he became angry with the [V]ictim for refusing to eat dinner he had prepared and he had struck the [V]ictim with the food plate....

Stacie Delp, Kristine Ramer[,] and Nancy Pranskey, all coworkers of the [V]ictim, noted black eyes on the [V]ictim, with Ms. Delp also observing the injured leg. Only Ms. Pranskey testified that the [V]ictim told her that the injuries were inflicted by Mr. Campbell.

On the evening of May 9, 2009, while Mr. Campbell, his wife[,] and his friend, Martin Costanza, were patrons at Harvey Run Inn, a local tavern, Crystal Barnes, an employee, overheard Mr. Campbell, following a telephone conversation, say loudly to his wife, "cha-ching, cha-ching[."] Ms. Barnes admitted to being unaware of the meaning of Mr. Campbell's remarks. Approximately two to three

months following the [V]ictim's death, Mr. Campbell was advised by correspondence from Wal–Mart, the [V]ictim's employer, that he was the beneficiary of the [V]ictim's retirement account in the amount of $1,893.34 and life insurance benefits in the amount of $22,000.00. The [V]ictim had designated Mr. Campbell the beneficiary as her common-law husband on June 27, 2005, approximately four years prior to her death. Mr. Campbell denied any knowledge that he was the [V]ictim's beneficiary prior to receiving notice from her employer. He, in fact, received the proceeds from both the retirement account and the life insurance as a result of [the Victim's] death.

Mr. Campbell also was the surviving joint tenant of the residence, and thus became sole owner following the [V]ictim's death. Testimony indicated that the balance of the mortgage was approximately $30,000.00 with the value of the home estimated at $10,000.00 due to its deteriorated condition.

In rebuttal, the Commonwealth introduced the medical records of the [V]ictim from Heritage Valley–Beaver Hospital for the period from 2004 through 2008, which revealed that she was treated on several occasions as a result of injuries sustained by falling.... [During trial, the] thrust of [Appellant's] defense was that Mr. Campbell had the motive and opportunity to kill the [V]ictim, since he would benefit financially by her death, and that he had physically abused the [V]ictim in the past.

Com. v. Dennerlein, 2065 WDA 2014, 2015 WL 7187562, at *1–9 (Pa. Super. Nov. 16, 2015), ECF No. 13-8 at 2 - 15.

## II.  PROCEDURAL HISTORY

### A.  State Court Procedural History

The Pennsylvania Superior Court, in its November 16, 2015 Memorandum also adopted the PCRA trial court's recounting of the state court procedural history as follows:

On July 17, 2009, [Appellant] was charged with [murder]. ... The charge [ ] stem[med] from an incident that occurred in Freedom Borough, Beaver County, Pennsylvania, in either the late evening hours of May 12 or early morning hours of May 13, 2009. The victim, Elizabeth Grosskopf [ (hereinafter "the Victim") ], was found dead in her residence at 1475 Fifth Avenue, Freedom Borough, Beaver County, Pennsylvania. An autopsy determined that [the Victim] died due to multiple stab wounds to the head and neck areas. After an investigation by the Freedom Borough Police and the Beaver County Detectives' Bureau, [Appellant] was charged with homicide.

The case was scheduled for a jury trial before the Honorable John Dohanich....
[T]he jury convicted [Appellant] of [first-degree] murder on August 3, 2010. On
September 29, 2010, Judge Dohanich sentenced [Appellant] to life imprisonment
without [the possibility] of parole.

No post-sentence motions were filed, but a timely notice of appeal was filed with
the Superior Court [ ] on October 27, 2010.[1] [The Superior Court affirmed
Appellant's judgment of sentence on April 2, 2012 and the Pennsylvania Supreme
Court denied Appellant's petition for allowance of appeal on October 22, 2012].

[1 Petitioner raised the following two claims in his brief on
direct appeal to the Pennsylvania Superior Court:

I.  THE EVIDENCE WAS INSUFFICIENT TO SUPPORT
THE CONVICTION FOR FIRST DEGREE MURDER…

II.  THE COMMONWEALTH WITNESSES'
TESTIMONY REGARDING THE CIRCUMSTANCES
SURROUNDING THE ALLEGED INCIDENT CANNOT
SUPPORT THE VERDICT OF THE JURY….

ECF No. 12-3 at 2.]

[Appellant] filed a timely *pro se* [PCRA] petition[ ] and [the PCRA trial court
appointed counsel] to represent [Appellant] in the post-conviction proceeding[s].
[Appointed counsel] filed an amended [PCRA petition on Appellant's behalf and
the PCRA] court conducted a hearing on the petition on August 4, 6[,] and 8 [,]
2014....

Com. v. Dennerlein, 2015 WL 7187562, at *1; ECF No. 13-8 at 1 – 2.

The Superior Court affirmed the denial of PCRA relief and adopted the reasoning of the

PCRA trial court as its own.  Id. at *18, ECF No. 13-8 at 28 ("We have reviewed the briefs of the

parties, the relevant law, the certified record, and the well-written and through opinion from the

able PCRA court judge, the Honorable James J. Ross. We conclude that the claims raised in

Appellant's brief fail and that Judge Ross' opinion, filed on November 19, 2014, meticulously

and accurately explains why Appellant's claims fail. Therefore, we adopt the PCRA court's

opinion as our own.").

After the Superior Court affirmed the denial of PCRA relief, Petitioner filed a counseled Petition for Allowance of Appeal with the Supreme Court of Pennsylvania, which denied relief on March 24, 2016.

### B. Federal Court Procedural History

Petitioner filed a Motion for Leave to Proceed In Forma Pauperis ("IFP Motion") and paid the filing fee. Because Petitioner paid the fee, the Petition was filed and the IFP Motion was denied as moot. ECF Nos. 1 and 3.

In the instant Petition, Petitioner raises three Grounds for Relief:

**GROUND ONE**: Defendant was denied his Constitutional Right to the effective assistance of trial counsel for failure to cross examine Commonwealth witnesses regarding past criminal history.

ECF No. 1 at 5.

**GROUND TWO**: Lower Court abused its discretion in failing to rule on the argued issues of Defendant's authorized access to victim[']s bank account during the preceeding [sic] 5 months before the murder.

Id. at 7.

**GROUND THREE**: Defendant was denied his Constitutional Right to the effective assistance of trial counsel for two Commonwealth witnesses being permitted to testify about prior incarcerations of the defendant not related to incarceration for the charged offense.

Id. at 8.

After being granted an extension of time to file the Answer, Respondents filed their Answer to the Petition, denying that Petitioner was entitled to any relief. ECF No. 8. Respondents also filed photocopies of much of the state court record. ECF Nos. 10 – 13. Thereafter, Petitioner filed a Traverse. ECF No. 18.

All parties have consented to the exercise of plenary jurisdiction by a United States Magistrate Judge.  ECF Nos. 15 and 17.

## III.  APPLICABLE LEGAL PRINCIPLES

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, tit. I, §101 (1996) (the "AEDPA") which amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254 was enacted on April 24, 1996.  Because Petitioner's habeas Petition was filed after its effective date, the AEDPA is applicable to this case.  Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000).

Where the state court has reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue is also raised in a federal habeas petition, the AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  See 28 U.S.C. § 2254(d) and (e).

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court has expounded upon the standard found in 28 U.S.C. § 2254(d).  In Williams, the Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States." Id. at 404-05 (emphasis deleted).  A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts could apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court. Secondly, the state courts can apply the correct rule of law but reach an outcome

that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case.

In addition, it is to be stressed that we look to the United States Supreme Court holdings under the AEDPA analysis as "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Rodriguez v. Miller, 537 F.3d 102, 106–07 (2d Cir. 2008) (citing Carey v. Musladin, 549 U.S. 70 (2006)).  The United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.'"  Dennis v. Sec., Pennsylvania Dept. of Corrections, 834 F.3d 263, 368 (3d Cir. 2016) (quoting, Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam)).  As the United States Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." White v. Woodall, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

## IV. DISCUSSION

### A. Ground One Does Not Merit Relief.

In Ground One, Petitioner asserts that his trial counsel was ineffective for failing to impeach several of the Commonwealth witnesses with their history of crimen falsi or with the fact that they had pending charges or parole violations and the witnesses' potential desire for favorable treatment from the Commonwealth in exchange for their testimony against Petitioner.

The PCRA trial court, and hence, by adoption, the Superior Court addressed this issue on the merits. Dennerlein, 2015 WL 7187562, at *40–42; ECF No. 13-1 at 41 - 45.

### 1. The decision of the state courts is not contrary to Strickland.

In addressing the claim of trial counsel's alleged ineffectiveness raised in Ground One, both the PCRA trial court and the Superior Court, by adoption, applied the state court test for ineffective assistance of counsel derived from Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987) (the "Pierce standard"). Dennerlein, 2015 WL 7187562 at *37; ECF No. 13-1 at 36 – 37. The Pierce standard has been found to be materially identical to the test enunciated in Strickland v. Washington, 466 U.S. 668 (1984). Werts, 228 F.3d at 203. The United States Court of Appeals for the Third Circuit has ruled that this standard is not "contrary to" Strickland in the sense of being a wrong rule of law. Indeed, Petitioner concedes as much. ECF No. 18 at 13 ("The Pennsylvania standard in **Pierce** has been found to be materially identical to the 2 prong test in Strickland."). Hence, Petitioner cannot show that the Superior Court's disposition of Ground One is contrary to United States Supreme Court precedent in the first sense of applying a wrong rule of law. Nor has Petitioner shown that the Superior Court's disposition is contrary to United States Supreme Court precedent in the second sense, i.e., he fails to point to a case decided by the United States Supreme Court where the facts are indistinguishable from his case

but where the state court reached an outcome different from the outcome reached by the United States Supreme Court.

**2. The state courts did not unreasonably apply <u>Strickland</u>.**

Moreover, Petitioner has failed to show that the PCRA trial court's and the Superior Court's decision was an unreasonable application of Supreme Court precedent on ineffective assistance of counsel.

In <u>Strickland</u>, the United States Supreme Court explained that there are two components to demonstrating a violation of the right to effective assistance of counsel.

First, the defendant must show that counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness." <u>Id</u>. at 688; <u>see also</u> <u>Williams v. Taylor</u>, 529 U.S. at 390-91. In reviewing counsel's actions, the court presumes that counsel was effective. <u>Strickland</u>, 466 U.S. at 689. There is no one correct way to represent a client and counsel must have latitude to make tactical decisions. <u>Lewis v. Mazurkiewicz</u>, 915 F.2d 106, 115 (3d Cir. 1990)("[W]hether or not some other strategy would have ultimately proved more successful, counsel's advice was reasonable and must therefore be sustained."). In light of the foregoing, the United States Court of Appeals for the Third Circuit has explained, "[i]t is [] only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." <u>United States v. Kauffman</u>, 109 F.3d 186, 190 (3d Cir. 1997)(<u>quoting</u> <u>United States v. Gray</u>, 878 F.2d 702, 711 (3d Cir. 1989)).

Second, under <u>Strickland</u>, the defendant must show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687. To

establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Williams, 529 U.S. at 391.

Moreover, because the state courts addressed Petitioner's claims of ineffectiveness on the merits, this Court must apply the deferential standards of the AEDPA as to those claims, which results in a doubly deferential standard as explained by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id.*, at 689 [104 S.Ct. 2052]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles*, 556 U.S., at ——, 129 S.Ct., at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —— [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

Premo v. Moore, 562 U.S. 115, 122 - 123 (2011) (quoting Harrington v. Richter, 562 U.S. 86, 105 (2011)). Accord Grant v. Lockett, 709 F.3d 224, 232 (3d Cir. 2013) ("'A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself.' *Id.* Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.' *Pinholster*, 131 S.Ct. at 1403. Federal habeas courts must 'take a highly deferential look at counsel's performance' under *Strickland*, 'through the deferential lens of § 2254(d).'"), *rejected on other grounds by*, Dennis, 834 F.3d at 293.

In addressing Ground One, the state courts found that Petitioner had in fact met two of the three prongs of ineffectiveness to show that his trial counsel's performance was deficient for

failing to use the available evidence of crimen falsi and pending criminal proceedings to impeach the Commonwealth witnesses. Dennerlein, 2015 WL 7187562, at *40; ECF No. 13-1 at 42 ("All of these factors lead the Court to the conclusion that the first two prongs of the PCRA burden of proof requirements are met by this claim, namely, first, that the underlying argument has merit, and second, that counsel (Fuchel) had no reasonable strategic basis for his action or inaction. This requires the Court to consider, for purposes of this claim, only the third requirement, namely, whether the petitioner suffered prejudice because of counsel's ineffectiveness."). Accordingly, both the PCRA trial court and the Superior Court, by adoption, went on to consider the question of whether Petitioner could establish prejudice as is required to mount a successful ineffectiveness of counsel claim.

Both the PCRA trial court and the Superior Court, by adoption, found that Petitioner failed to carry his burden to prove any prejudice from his trial counsel's deficient performance. Specifically, the Honorable James Ross, as PCRA trial court judge, held:

> While defendant's claim does have merit, it only relates to a portion of the Commonwealth's case against him. The failure to cross-examine these witnesses, with regard to prior convictions, relates only to admissions allegedly made by the defendant and his use of the victim's credit/debit card for purposes of furthering his drug habit.[2] If this was the extent of the evidence against defendant, this claim would surely be meritorious and result in a new trial. However, there was significant other evidence against the defendant that was not affected by this lack of cross-examination.
>
> _____
>
> [2] The Court also notes that even though these matters were not covered in cross-examination of the witnesses, other matters were covered, such as the incarcerated status of some of the witnesses and drug selling or dependency status of others that cast them in an unfavorable light in the jury's eyes and thereby called their credibility into question.
>
> For example, there was testimony regarding defendant's statement to Beaver County Detectives Patrick and Clements that is detailed at length at pages

11–13 of this Opinion. That testimony reflects that defendant attempted to explain away his involvement in this matter and provide quasi-alibi evidence to exonerate himself. The defendant specifically stated that he took the victim to work on the night of the incident and then went back to pick her up, but she was not at work. Video evidence from the victim's employer clearly showed that the victim never came to work on that date. Defendant also stated that he was watching a hockey game with his girlfriend at the victim's residence on the night in question. This portion of the statement was directly contradicted by the girlfriend who denied that she ever went to the victim's residence on that date.

Moreover, the Commonwealth presented records of ATM transactions and cellular telephone calls, in chronological order, that are detailed at pages 13 through 16 of this Opinion. As stated at page 16 of this Opinion, this information, together with the known observations of the defendant from witnesses and video displays of the defendant at bank, ATM and retail locations, placed the defendant in the area of the victim's residence during the hours when she would have been killed.

Most importantly, a DNA examination of blood found on the defendant's blue jeans matched the victim's blood. That same DNA analysis could not exclude the blood of the victim as a potential contributor to a blood stain found on the defendant's shoes and could not exclude the defendant as a potential contributor of blood found on a knife in the kitchen, which was apparently the murder weapon. Dr. James Smith, a forensic pathologist, testified that the victim died as a result of stab wounds to the neck.

This evidence, when coupled with an abundance of other circumstantial evidence recited in the Facts section of this Opinion between pages 2 and 20, clearly overcomes any claim of prejudice made by the defendant in this claim of his petition. The Court, in its discretion, does not believe that the alleged ineffectiveness by this issue, alone, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place and, therefore, denies the petition on the basis of this claim.

PCRA trial court opin., ECF No. 13-1 at 43 – 45 (some footnotes omitted).

Petitioner fails to convince this Court, as is his burden, that the foregoing disposition of his Ground One claim of ineffectiveness is an unreasonable application of Supreme Court precedent on ineffectiveness.

And this is so, even in light of Petitioner's assertion in his Traverse, that there is absolutely no evidence supporting the assertion made in the PCRA trial court opinion regarding

"the defendant as a potential contributor of blood found on a knife in the kitchen, which was apparently the murder weapon." <u>Dennerlein</u>, 2015 WL 7187562, at *41; ECF No. 13-1 at 44. ECF No. 18 at 16 ("Absolutely nowhere in the entire trial record was it even suggested that this knife was the murder weapon as it had two unidentified individuals [sic] DNA on it, and although the defendant (Petitioner) could not be excluded as a possible contributor, the victim's DNA was *not* on the knife.").   Petitioner also makes this assertion in his Petition, <u>i.e.</u>, that there is no evidence showing that the knife in the kitchen was the murder weapon.  <u>See</u> ECF No. 1 at 7 ("The PCRA Court … ruled Defendant[']s other claim of counsel failing to properly cross-examine Commonwealth witnesses was in fact meritorious, but denied relief on a perceived 'prejudice threshold' not being met by Defendant only after erroneously concluding that a knife recovered from the crime scene was the murder weapon….").

Even if Petitioner's contention were true that no record evidence supports a finding that the kitchen knife was the murder weapon, we find that the argument is really an argument by Petitioner that the PCRA courts made an unreasonable determination of the facts.  We reject this claim for two reasons.  First, the PCRA courts did not make a definitive finding of fact that the knife found in the kitchen was the murder weapon, noting instead merely that it was "**apparently the murder weapon**." ECF No. 13-1 at 4 (emphasis added).  Secondly, we do not find the statement concerning the knife being the apparent murder weapon to invalidate the other reasons given for finding that Petitioner failed to prove prejudice.  Hence, Petitioner has not shown, as is his burden, that the state courts made an unreasonable determination of the facts or unreasonably applied the Supreme Court law of ineffectiveness.

### 3. Ground One fails even under *de novo* review.

Furthermore, even if we were to conduct *de novo* review of the issue of ineffectiveness of counsel, we would reach the same conclusion because we find that Petitioner, on this record, cannot establish prejudice due to trial counsel's failure to impeach the Commonwealth witnesses. In doing so, we rely on the evidence recounted by the PCRA trial court above, other than the evidence concerning the knife found in the kitchen. We also rely on the fact that Commonwealth witness Zack Valentine was Petitioner's cell mate at the Beaver County Jail and he testified that Petitioner confessed the murder to him in the cell. Mr. Valentine took the stand and testified accurately to specific details concerning the murder scene that were unknown to the public. Specifically, the trial court in his April 7, 2011 Memorandum Opinion and Order, explaining why there was sufficient evidence of Petitioner's guilt, recalled Mr. Valentine's testimony as follows:

> Zack Valentine was the defendant's cellmate at the Beaver County Jail for approximately two weeks. On May 18, 2009, Mr. Valentine provided a statement to police in which he indicated that he had become acquainted with the defendant prior to their incarceration while working at Crow's Run Recycling. Mr. Valentine stated that the defendant acknowledged that he had killed the victim, wrapped her in a blue blanket and placed her body in the stairway to the attic between the two bedrooms in the victim's residence. The defendant also outlined the layout of the house and provided a diagram detailing the location of the bedrooms and the doorways from each bedroom to the attic. The defendant further described the placement of a tan blanket covering the blood on the bed and complained that Mr. Campbell had pulled the blanket away exposing the blood. Mr. Valentine, who had never been to the residence drew a diagram of the residence based upon the defendant's description. Mr. Valentine had been unaware of the homicide until his conversation with the defendant.

ECF No. 11-12 at 22 – 23. Indeed, the Superior Court, on direct appeal, found that "Valentine further testified that Dennerlein had revealed details about the crime that were not public knowledge." ECF 12-7 at 39. Petitioner has no persuasive explanation for how Valentine knew

non-public information about the murder scene and he points to no evidence that could persuasively impeach Valentine in this regard. Certainly, the mere fact that Valentine was in jail or facing other charges or had motive to cooperate with the Commonwealth could not explain away Valentine's non-public knowledge. Therefore, we find that Mr. Valentine's testimony regarding Petitioner's confession, which included these publicly unknown facts, weighs heavily, if not conclusively, against Petitioner being able to show prejudice, i.e., a reasonable probability that the result of the trial would have been different had his counsel not performed deficiently.

Accordingly, Ground One does not provide a basis for relief in this federal habeas proceeding.

**B. Ground Two Does Not Merit Relief.**

In Ground Two, Petitioner argues that the "lower court," meaning thereby, the PCRA trial court, "abused its discretion in failing to rule on the argued issues of Defendant's authorized access to victim[']s bank account during the preceeding [sic] 5 months before the murder." ECF No. 1 at 7. See also ECF No. 18 at 7 ("PCRA Judge Ross … failed entirely to address Petitioner's claim in his Memorandum Opinion…"); id. at 8 ("Once the PCRA court refused to acknowledge the argued claim…"); id. at 10 ("not only did the PCRA judge fail to acknowledge the bank records as evidence in his Opinion denying Petitioner relief"). This claim fails for four independent reasons.

First, to the extent that this is an assertion that the PCRA trial court erred in failing to address Petitioner's claim that his trial counsel was ineffective for failing to adduce evidence of Petitioner's access to the victim's bank account many months before the murder, such an assertion of error in the PCRA proceedings is not a claim which is cognizable in federal habeas proceedings as a ground for relief. Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998)

("The federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation. . . . Federal habeas power is 'limited ... to a determination of whether there has been an improper detention by virtue of the state court judgment.'"); Lambert v. Blackwell, 387 F.3d 210, 247 (3d Cir. 2004) ("alleged errors in collateral proceedings ... are not a proper basis for habeas relief from the original conviction.").

Secondly, the factual premise of the claim, i.e., that the PCRA trial court failed to address the issue of trial counsel's failure to introduce evidence of Petitioner's permitted access to the victim's bank account, is simply wrong as a matter of fact. The PCRA trial court certainly did address this particular claim as follows:

> The major issues raised by defense counsel at the [PCRA] hearing in August 2014 was trial defense counsel failed to use prior bank statements to cross-examine witnesses and establish that defendant had used the victim's credit/debit card not only at our [sic] around the time of the homicide, but also in advance of the same, thereby showing that defendant had consented-to access to the card. The evidence of record establishes, through the testimony of Laura Rankin, that the defendant was accorded the ability to place this matter before the jury by Rankin's testimony that the defendant not only had access to the card but also to the PIN as stated in the Facts section above (Trial Tr, Vol. IV, pp. 340-41). This issue, in the estimation of the Court, does not arise to a meritorious claim based upon the evidence in the trial transcript and the evidence adduced at the PCRA hearing.

ECF No. 13-1 at 38.

We understand the foregoing conclusion by the PCRA trial court, concerning Petitioner's claim that his trial counsel was ineffective for failing to adduce evidence of Petitioner's authorized access to the victim's account months prior to the murder, to be a conclusion that Petitioner failed to carry his burden to show his counsel was ineffective. More specifically, we

find it to be a conclusion that Petitioner's trial counsel did not render deficient performance because counsel, in fact, caused some evidence of Petitioner's consented-to prior access to the victim's bank account to be presented to the jury.[1]

---

[1] Petitioner complains that "[t]he PCRA court after allowing this evidence/testimony [of his access to the victim's bank account months prior to the murder] to be introduced on the record [during the PCRA hearing], simply relied on the bank record evidence *as presented at trial* in weighing the prejudice prong." ECF No. 18 at 15 – 16. First, we do not think that the PCRA trial court was addressing the prejudice prong but was instead addressing the deficient performance prong when disposing of this particular claim of ineffective assistance. Secondly, we fail to see how the PCRA trial court erred in finding that, at trial, evidence of Petitioner's permitted access to the victim's bank account was in fact presented to the jury, and, therefore, Petitioner's trial counsel did not perform deficiently.

The error which Petitioner claimed in the PCRA petition was "Ineffective assistance of counsel for failure to investigate, present evidence and call witnesses concerning defendants [sic] access to victims [sic] bank account(s)." ECF No. 12-10 at 10. It seems that Petitioner was therein complaining that his counsel failed to present any evidence of his consented to prior access to the victim's bank account. The PCRA trial court found that Petitioner's counsel had presented such evidence of Petitioner's prior consented to access. Now, here before this Court, Petitioner is apparently complaining, not that his trial counsel was ineffective for failing to adduce such evidence of his consented to access, but is now complaining that his trial counsel was ineffective for not producing **more** evidence of his consented to access to the victim's bank account, namely, all of the evidence of such which was adduced at the PCRA hearing. We hold that the PCRA trial court's reliance on the fact that Petitioner's trial counsel presented some evidence of Petitioner's access in finding that counsel did not perform deficiently, did not constitute error. Furthermore, we will not assume that the PCRA trial court, having heard all of the evidence, concerning Petitioner's prior access to the bank accounts, ignored such evidence, even if the PCRA trial court did not explicitly refer to all such evidence in its opinion. Turner v. Coleman, CV 13-1787, 2016 WL 3999837, at *7 (W.D. Pa. July 26, 2016) ("To the extent that Petitioner contends merely because the trial court's opinion does not mention Petitioner's mental retardation and, therefore, the opinion is silent with respect to a consideration of 'Turner's characteristics,' it necessarily follows that the trial court, in fact, failed to consider Turner's characteristics, the argument is a losing argument for Petitioner."). Lastly, even if the PCRA trial court had committed some error in disposing of this claim of ineffective assistance of trial counsel, we find, under *de novo* review, that Petitioner cannot show prejudice from any assumed deficient performance on the part of his trial counsel, as we discuss below.

Third, to the extent that Petitioner is attempting to assert in Ground Two that his trial counsel was ineffective for failing to introduce "sufficient" evidence of his permitted access to the victim's bank account, months prior to the murder and that the state court's adjudication of this claim was contrary to or an unreasonable application of United States Supreme Court law of ineffectiveness, Petitioner has failed to carry his burden under AEDPA to convince this Court. We find the above disposition by the PCRA trial court, i.e., trial counsel did not perform deficiently because he, in fact, presented some such evidence to the jury, to be arguably reasonable. At the very least, Petitioner fails to show that the state courts' disposition of this claim was objectively unreasonable, as is his burden. Wurst v. Overmyer, CV 17-336, 2018 WL 4005874, at *3 (W.D. Pa. Aug. 22, 2018) ("To satisfy his burden under this clause of § 2254(d)(1), the Petitioner must do more than convince this Court that the Superior Court's decision was incorrect. *Id.* He must show that it 'was objectively unreasonable.' *Id.* '[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision[,]' it is not an unreasonable one.") (some citations and internal quotations omitted).

Lastly, even if we were to review such an ineffectiveness claim *de novo*, we would conclude that Petitioner fails to show prejudice, based upon our previous reasoning, disposing of Ground One.

For the reasons set forth herein, Ground Two does not afford Petitioner a basis for relief in this federal habeas corpus proceeding.

**C.  Ground Three Does Not Merit Relief.**

In Ground Three, Petitioner claims that he was denied the effective assistance of trial counsel because trial counsel permitted two Commonwealth witnesses to testify about prior

incarcerations of Petitioner which he asserts could not have reasonably been understood by the jury to have been related to his then current charges in the murder of the victim in this case.

The PCRA trial court, and hence, the Superior Court by adoption, addressed this claim and found that Petitioner had failed to carry his burden to show his trial counsel was ineffective. Specifically, the PCRA trial court held as follows:

> At the PCRA hearing, as noted in the Facts section above, Fuchel [i.e., Petitioner's trial counsel] testified that it was his trial strategy for this information [i.e., that Commonwealth witnesses who testified they had met Petitioner in jail] to come into evidence because he thought it would be helpful for the jury to know that Campbell, who was the individual that defense counsel hoped to pin blame on, had been in jail in the past and, and therefore, had a questionable background himself. The Commonwealth stipulated, at the PCRA hearing, that this information came before the jury at the request of the defendant with no objection or curative instruction requested. To the Court's information and understanding, there was no reference as to why the defendant was in jail before or during the trial. The only reference was to the fact that defendant was in jail.

> "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interest." *Commonwealth v. Howard*, 533 Pa. 266, __, 719 A.2d 233, 237 (1998). The *Howard* Court also noted that a claim for ineffective assistance of counsel cannot succeed by simply comparing, by hindsight, the trial strategy employed with alternatives not pursued. "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id*.

> In this case, the trial testimony not only included the references noted with regard to the *Campbell* [sic] testimony above, but also included the testimony of Zachary Valentine, who was defendant's cell mate when admissions regarding the homicide and defendant's involvement in the same were made. Valentine's testimony clearly reflected that the admissions were made while he and the defendant were incarcerated together. (Trial Tr. Vol. V, pp. 160-16). [sic] This reference was unavoidable in order to set the stage in which the admissions occurred. Again, there was no reference to why the defendant was in jail.

> Defense counsel made it clear that his strategy was to attempt to paint a sordid picture of Commonwealth witnesses, such as Campbell and Valentine, by not only permitted references to their past as prisoners when questioned by the

Commonwealth, but also by bringing it out himself when he questioned the witnesses. This trial strategy cannot be said to be unreasonable under the circumstances.

Furthermore, the Pennsylvania Supreme Court decision in *Commonwealth v. Johnson* 838 A.2d 663 (Pa. 2003) is instructive and warrants a determination that this claim lacks merit. In *Johnson*, the Pennsylvania Supreme Court specifically stated that "although generally no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a previous crime . . . there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for crimes charged." *Id*. at 680 (citation omitted). In *Johnson*, the Supreme Court also cited *Commonwealth v. Wilson*, 538 Pa. 485, 506-07, 649 A.2d 435, 445-46 (1994) for the proposition that testimony indicating that the defendant was incarcerated prior to trial was not improper where the jury could reasonably infer that the defendant's incarceration was the result of the criminal acts for which the defendant was on trial. In this case, although there was reference to the fact that defendant was in jail prior to trial, there was no reference as to why he was in jail, which would give rise to the inference that the defendant was detained as a result of the case for which he was on trial, and, therefore, proper under *Johnson* and *Wilson*.

ECF No. 13-1 at 40 – 41.

Petitioner fails to carry his burden to show that this disposition of his claim that counsel was ineffective for permitting the introduction of evidence of his incarceration into evidence is contrary to or an unreasonable application of United States Supreme Court precedent on ineffectiveness.[2] Both the PCRA trial court's and the Superior Court's disposition of this claim

---

[2] The explanation given for Petitioner's trial counsel wanting or permitting the evidence of Petitioner's incarceration to come before the jury, was that trial counsel felt that there was no other way to get the fact before the jury that Commonwealth witnesses were also incarcerated. We accept that this explanation satisfies a reasonable basis for allowing this evidence of Petitioner's incarceration to come in. However, we fail to see how this explanation provides a reasonable ground for his trial counsel not seeking a limiting instruction as to how the jury should consider the evidence of Petitioner's incarceration, a claim of ineffectiveness that Petitioner also makes. See, e.g., ECF No. 18 at 23 ("mention of incarceration for an offense other than the charged offense to establish a 'confession' made by a defendant would not fall under a situation where trial counsel might reasonably decline a limiting instruction to avoid drawing attention to the previous incarceration already made known."); ECF No. 13-4 at 2 ¶ 2.

(… footnote continued)

28

is at least arguably correct.  Certainly, Petitioner does not show that the disposition is objectively unreasonable.

Even if we were to review Petitioner's Ground Three *de novo*, we would find for the same reasons that Petitioner failed to establish prejudice under Grounds One and Two, that he likewise fails to show prejudice as to Ground Three.   Accordingly, Petitioner's Ground Three does not provide a basis for relief in this federal habeas proceeding.

## V.  CERTIFICATE OF APPEALABILITY

A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2).  The Court concludes that jurists of reason would not find it debatable whether the Petitioner made a substantial showing of the denial of a constitutional right.  Accordingly, a certificate of appealability will be denied.

---

Nevertheless, as we note immediately below, we find the claim of ineffectiveness of Petitioner's trial counsel for introducing this evidence of his incarceration and for not seeking a limiting instruction fails, even under *de novo* review, to establish prejudice.

## VI. CONCLUSION

**AND NOW,** this 15th of May 2019, it is hereby **ORDERED** that for the reasons set forth herein, the Petition is **DENIED**. Because we conclude that jurists of reason would not find the foregoing debatable, a certificate of appealability is likewise **DENIED**.

BY THE COURT,

MAUREEN R. KELLY
UNITED STATE MAGISTRATE JUDGE

cc: BENJAMIN DENNERLEIN
JT1142
SCI Rockview
Box A
Bellefonte, PA 16823-09820

All counsel of record via CM-ECF